IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHEN B. COREY,                        )
                    Plaintiff,           )
                                         )
          v.                             )        Civil Action 05-114
                                         )
SAMUEL J. NASSAN, II,                    )
individually and in his capacity         )
as an officer of the Pennsylvania        )
State Police, and JEFFERY B.             )
MILLER, in his capacity as               )
commissioner of the Pennsylvania         )
State Police.                            )
                    Defendants,          )
                                         )

MEMORANDUM ORDER

CONTI, District Judge

     In this memorandum order, the court considers the motion for summary judgment (Doc. No. 25) filed by defendants Samuel J. Nassan, ("defendant Nassan") and Jeffery B. Miller, the Commissioner of the Pennsylvania State Police ("defendant Miller," and together with defendant Nassan, "defendants"), with respect to all claims against them asserted by plaintiff Stephen B. Corey ("plaintiff" or "Corey").

     The court previously held a hearing on defendants' motion to dismiss in this matter.  See Defendants' Motion for Summary Judgment ("Def. Mot. for S.J."), Appendix ("App.") C  (Doc. No. 20) (July 25, 2005 Transcript of Hearing on Motion to Dismiss).  At the hearing, the court noted on the record that Count II, alleging that the actions of defendants violated plaintiff's Fourth Amendment rights, was dismissed by consent of plaintiff.  Id. at 7.  The court ruled that the remaining count, Count I, alleging that the actions of defendants violated plaintiff's First

Amendment rights, would be dismissed with respect to the Pennsylvania State Police as to both monetary damages and prospective injunctive relief and dismissed with respect to monetary damages as to defendant Miller.  Id. at 7-9.  The court, however, determined that plaintiff's claims under Count I could go forward against defendant Nassan for both monetary damages and injunctive relief and against defendant Miller only for injunctive relief.  Id. at 8-9.  Defendants' motion for summary judgment demonstrates that defendants understood the court's ruling to be dismissing the Pennsylvania State Police only as to monetary damages.  The court, however, dismissed all claims against the Pennsylvania State Police and, therefore, will not consider arguments against it at this stage in the proceedings.

 After considering the joint statement of material facts and the respective motions and briefs submitted by the parties, the court will grant in part and deny in part defendants' motion for summary judgment for the reasons set forth herein.


### *Background Facts*

At the time of the incident in question, plaintiff worked as a flight attendant for US Airways out of Pittsburgh International Airport.  See Def. Mot. for S.J., App. A (November 18, 2005 Deposition of Stephen B. Corey) ("Corey Dep.") at 7.  Plaintiff had worked for US Airways for approximately ten years.  Id.  Defendant Nassan was a trooper with the Pennsylvania State Police stationed in Pittsburgh, Pennsylvania.  Def. Mot. for S.J., App. B (October 14, 2005 Deposition of Samuel J. Nassan III) ("Nassan Dep.") at 7.  At the time the following events took place, defendant Nassan had been with the Pennsylvania State Police for approximately two and

one-half years  – he had spent approximately seven months of that time in training and the

remainder of that time working under the rank of "Trooper."  See Nassan Dep. at 6.

On June 25, 2004, at approximately 5:00 p.m., plaintiff and defendant Nassan were

driving west along State Route 22/30.  Nassan Dep. at 10; see Corey Dep. at 10 (referring to the

roadway in question as "the Parkway between Interstate 79 and Campbells Run Road going

towards the airport").  At some point, defendant Nassan pulled plaintiff over to the side of the

road.  Nassan Dep. at 15; Corey Dep. at 11.  Defendant Nassan testified that he pulled plaintiff

over for following too closely and speeding.  Nassan Dep. at 16.  The incident leading to the stop

occurred while plaintiff was driving directly behind defendant in the left-hand lane.  Id. at 10;

Corey Dep. at 11.

Specifically, defendant Nassan testified that while plaintiff and he were driving in the

left-hand lane,  plaintiff "traveled behind me closer than one vehicle's distance for several

hundred yards."  Nassan Dep. at 10.  At some point, defendant Nassan switched lanes, moving

from the left-hand lane to the right-hand lane, allowing plaintiff to pass him.  Nassan Dep. at 10;

Corey Dep. at 10-11.  After plaintiff passed him, defendant Nassan pulled into the left-hand lane

and positioned his patrol vehicle directly behind plaintiff's vehicle.  Nassan Dep. at 10, 13.

Defendant Nassan testified, at that point, he clocked plaintiff going 70 miles per hour.  Id. at 10,

15.  Defendant Nassan activated his lights and siren, pulled plaintiff over to the side of the road,

and conducted a traffic stop.  Nassan Dep. at 15; see Corey Dep. at 11.

Defendant Nassan testified that plaintiff became agitated by the stop and asked why he

was being pulled over.  Nassan Dep. at 15.  Plaintiff testified that defendant Nassan asked him

"Do you know why I'm stopping you?" and when plaintiff said "No, I don't," defendant Nassan

informed him that he was following defendant Nassan very closely and was going 70 miles per hour when he passed defendant Nassan.  Corey Dep. at 11.  Plaintiff testified that he found it hard to believe that he was going 70 miles per hour.  Id.  At this traffic stop, defendant Nassan issued plaintiff two citations, one for following too closely and the other for speeding.[1]  See Nassan Dep. at 16-17; see Corey Dep. at 12.

While they were stopped, after the citations had been issued, defendant Nassan and plaintiff engaged in a brief conversation.  See Nassan Dep. at 15-17; see Corey Dep. at 11-13.  Defendant Nassan testified that he informed plaintiff that they were headed in the same direction, plaintiff on his way to the airport and defendant Nassan on his way to barracks, and said: "I'm going to be behind you.  If you speed again, I'm going to stop you again."  Nassan Dep. at 17.  The plaintiff testified that Defendant Nassan stated: "By the way, I'm going to follow you all the way to the airport." Corey Dep. at 12, 13.  The two returned to their vehicles and continued traveling in the same direction.  Id.

To the west of the location where defendant stopped plaintiff, State Route 22/30 becomes State Route 60.  See Nassan Dep. at 18.  State Route 60 forks and the left-hand lanes remain State Route 60 while the right-hand lanes become the left lane for State Route 60 Business.  Nassan Dep. at 18; see Corey Dep. at 13.  Near this fork in the road, plaintiff and defendant Nassan had another interaction while still in their vehicles.  It is unclear from the record exactly where each driver was located in relation to the other when they approached the State Route 60 and State Route 60 Business split.  Apparently, however, after the split, plaintiff took the left fork and continued traveling on State Route 60 while defendant Nassan took the right fork and

---

[1] These citations are not part of the record.

continued traveling on State Route 60 Business towards his barracks.  Nassan Dep. at 22; Nassan

Dep., Exhibit ("Ex.") B (hand-drawn picture).

Plaintiff testified that defendant Nassan and he were in different lanes when they reached

the fork.  Corey Dep. at 13.  Plaintiff claims that he did not change lanes immediately preceding

or during the split in the road.  J.S.¶4 (Respondent); Pl.'s Statement of Necessary Facts (Doc. No.

31) ¶ 10.  On the contrary, defendant Nassan testified that he observed plaintiff making an

improper right-hand lane change signal while "making his left lane change."  Nassan Dep. at 22.

Specifically, defendant Nassan testified that plaintiff "rais[ed] his hand vertically from the left

driver's side window at the same time he's making the lane change to the left."  Nassan Dep. at

23.  Defendant Nassan testified that at this moment his vehicle was to the right and just behind

plaintiff's vehicle, about "mid car."  Id. at 23, 25.  After observing plaintiff's hand gesture, which

defendant described as a "right-hand lane change when he's actually making a left-hand lane

change," defendant Nassan returned to the police barracks where he wrote a citation for plaintiff.

Nassan Dep. at 30-31.  Defendant Nassan testified at his deposition that he did not stop plaintiff

for a second time at that moment due to plaintiff's "confrontational attitude that he had from the

first stop" and because "I felt for my safety and his safety it wasn't best for me to stop him again,

it would just escalate the incident even further."  Id. at 23-24.

Four days later, plaintiff received a citation relating to his hand gesture in the mail.

Compl., Ex. A (citation); Nassan Dep., Ex. A (same); see Corey Dep. at 13.  The citation

indicated that plaintiff had violated a particular provision of the Pennsylvania Vehicle Code,

namely, 75 PA. CONS. STAT. § 3336(1) (2005), which describes the proper hand signal for

making a left turn (hereinafter the "proper hand signal provision").  See Compl., Ex. A (citation);

Nassan Dep., Ex. A (same); J.S. § 8; Def.'s Mot. for Summary Judgment Statement of

Undisputed Mat. Facts (hereinafter "Def.'s S.F.") ¶ 1.  The citation was signed by defendant Nassan, dated June 25, 2005, and filed by defendant Nassan's supervisor on June 27, 2005.  Id.; see Nassan Dep. at 29.  The citation is numbered MO215855-3 and references citation numbers which appear to be from the handwritten notations MO215853-1 and MO215854-2.  Id.

The proper hand signal provision describes the proper technique for exercising a hand or arm signal as a turn signal.  75 Pa. PA. CONS. STAT. § 3336 (2005).  The statute provides that "[a]ll signals given by hand and arm shall be given from the left side of the vehicle. . . ."  Id. (emphasis added). Concerning left turns, the provision of the statute in question provides that "[f]or a left turn, the hand and arm should be extended horizontally."  Id. at § 3336(1) (emphasis added).  On the citation given to plaintiff, defendant Nassan cited the proper hand signal provision and in the space provided for describing  the "Nature of Offense" described plaintiff's hand gesture as "Def did give an improper hand signal while passing my patrol car namely middle finger up."  Compl., Ex. A (citation)(emphasis added); Nassan Dep., Ex. A (same); see Nassan Dep. at 26.

In his deposition, plaintiff denied giving defendant Nassan the middle finger.  Corey Dep. at 13-14; see also Joint S.F. ¶ 5; Def.'s S.F. ¶ 5.  Rather, plaintiff testified that his gesture, made using his right hand was "a nod and a wave," similar to the British royal wave, whereby he extended his arm vertically and turned his palm inward and outward.  Id. (emphasis added).

Defendant Nassan testified that while he noticed the "middle finger up" gesture given by the plaintiff, its significance to him was "[n]one at all" and he regarded plaintiff's hand gesture only as an improper traffic signal.  Nassan Dep. at 27-28.  Def's S.F. ¶ 6.  During defendant Nassan's deposition, the following exchange took place between defendant Nassan and plaintiff's counsel:

Q.          Now you didn't mention this "middle finger up" when you told
            me about the signal he gave you.

A.          Well, that's what he used.  That's what I have written there.

Q.          Did that have any significance to you.

A.          None at all.

Q.          You didn't think he was being rude to you, or he was signaling
            you by that; is that correct?

            *** [Objection by defense counsel; ensuing colloquy between
                counsel; question repeated.]***

A.          That is correct.  I didn't think that he was being rude to me.
            That wasn't even on my mind at that time.  I was interested in
            the violation.

Nassan Dep. at 26-28.  Plaintiff contends, however, that defendant Nassan issued the citation in

question solely because he felt insulted by the hand gesture that he perceived and not due to any

driving violation by plaintiff.  Pl.'s Resp. to Def.'s Mat. Facts (Doc. No. 30) ¶ 2.

    Upon questioning concerning his reasons for issuing the citation, defendant Nassan

acknowledged that while he would not call it rare, it was "less likely" that people use hand

signals anymore.  Id. at 31.  He testified that he did not notice an automatic signal from plaintiff's

car.  Id.  When asked whether plaintiff could have been waving at him, he replied: "No.  It was a

clear violation of the code."  Id.  When asked whether waving would have been a violation of the

code he answered that it would not have been a violation "unless he elevated his arm vertically

from the window, which signals, while operating a motor vehicle in the state of Pennsylvania, a

right-hand lane change or turn."  Id.

    Upon questioning about his understanding concerning free speech and use of the middle

finger, the following exchange took place between defendant Nassan and plaintiff's counsel:

Q.           Now, are you aware of the various court cases that say that showing somebody a middle finger is free speech?

*** [Objection by defense counsel; question rephrased.]***

Q.           Are you aware of cases concerning showing somebody the middle finger?

A.           I'm aware of some.

Q.           What are you aware of?

A.            I'm aware that it is their freedom of speech to do that.  Unless it's done in the public view to where somebody can be offended, that could be considered disorderly conduct.

Q.           Are you aware of the cases that say this is not disorderly conduct?

*** [Objection by defense counsel.]***

A.           I am aware of some of the cases, yes.  I did not cite the Defendant [plaintiff] for disorderly conduct.  I cited him for a traffic violation.

Q.           I understand.

A.           Okay.  For the record.

Q.           So in your view of the law, would it be improper to cite the Defendant [plaintiff] for disorderly conduct in this situation?

*** [Objection by defense counsel; question repeated.]***

A.           It all depends if people were offended by his actions and he was in the motoring public at that time.  He could have been cited for disorderly conduct if, indeed, I chose to do so.  <u>He can use that gesture to a police officer at any time</u> unless somebody else in the public becomes offended by the gesture or comments that are made.

<u>Id.</u> at 35-37 (emphasis added).  Defendant Nassan clarified his understanding upon further questioning by plaintiff's counsel:

Q.       Okay.  You told me that in some situations it's okay to give a
         citation or make an arrest for disorderly conduct because of this
         hand signal; is that correct?

A.       For throwing somebody "the bird," for lack of a better term, for
         putting up their middle finger is what you asked, not for doing
         an improper hand and arm signal for a lane change.

                                    * * *

Q.       In some situations it's proper to give a citation or make an
         arrest for that; is that correct?

A.       As long as somebody is offended by the gesture, <u>other than the
         police officer</u>, yes.

<u>Id.</u> at 38-40 (emphasis added).  Defendant Nassan further acknowledged that he learned this

through his training with the State Police:  "They explain the Crimes Code to us.  We learn it in

Crimes Code courses when they hit that section of disorderly conduct.  If someone feels

provoked by the gesture, other than the police, it is considered disorderly conduct.  I can't cite the

subsection."  <u>Id.</u> at 40.  He further acknowledged his understanding that if it's just the policeman

who is provoked or irritated, then it would not be correct to issue a citation in response to

someone gesturing with their middle finger.  <u>Id.</u>   He stated:

         My belief is what I told you before.  If it offends somebody,
         regardless of where he's at, in the motoring public, in a shopping
         mall, and they feel that they are offended or provoked, it is; but if
         it's myself and another person and they decide to use an obscene
         gesture at me, it's not against the law.

<u>Id.</u> at 43.

         Defendant Nassan testified that he filled out the citation upon his return to the barracks

and turned it in on that same day.  Nassan Dep. at 29-30.  He testified that the citation, like other

citations, was turned in to his supervisor and his supervisor filed it two days later.  <u>Id.</u>  He

testified that he was required to turn citations in to supervisors on the day issued, but that the

citations "go through a process where they get checked by the supervisors."  Id.  He stated "[o]ur

supervisors check them, and then they file them."  Id.

On November 23, 2004, plaintiff was acquitted of the proper hand signal provision charge

after defendant Nassan did not appear for the trial relating to that charge in the Court of Common

Pleas for Allegheny County.  Compl. Ex. B (Order of Court)("Defendant adjudged not guilty

upon complainants failure to appear"); J.S. ¶ 7.  On February 1, 2005, plaintiff filed this civil

action against defendants for, inter alia, violation of his First Amendment right to

constitutionally-protected speech.  Compl. ¶ 20.


### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the

mere existence of some disputed facts, but will be defeated when there is a genuine issue of

material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine

the truth of the matter, but only to determine whether the evidence of record is such that a

reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may

consider any material or evidence that would be admissible or usable at trial in deciding the

merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing

WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35,

39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d. Cir. 1957), cert. denied, 355 U.S. 964 (1958) ("in

considering a motion for summary judgment, the court is entitled to consider exhibits and other

papers that have been identified by affidavit or *otherwise made admissible in evidence*.")

(emphasis added).


### *Analysis*

The right at issue in this case is the right to free expression without retaliation secured by

the First Amendment of the Constitution.  Plaintiff specifically alleges that defendant Nassan

violated his First Amendment rights when defendant Nassan issued him a traffic citation for

making an improper hand signal after defendant Nassan perceived plaintiff to raise his middle

finger at defendant Nassan.  Plaintiff additionally argues that defendant Miller is liable for

defendant Nassan's behavior under a theory of supervisory liability for failure to train.

Defendants move for summary judgment as a matter of law, making four arguments.

First, defendants argue that plaintiff cannot establish a prima facie case of First Amendment

retaliation because plaintiff expressly denies using the middle finger and defendants argue that,

therefore, plaintiff did not engage in constitutionally-protected speech.  Second, defendants argue

that defendant Nassan had probable cause to issue the citation, and that this defeats plaintiff's

First Amendment retaliation claim or entitles defendant Nassan to qualified immunity.  Third,

defendants argue that even if plaintiff can make out a prima facie case of First Amendment

retaliation, defendant Nassan is entitled to qualified immunity.  Fourth, defendants contend that

defendant Miller is entitled to judgment as a matter of law on plaintiff's theory of supervisory

liability because defendant Nassan is entitled to judgment as a matter of law.  Id.  The court will

address each argument in turn.

**I. Whether Defendants Are Entitled to Judgment as a Matter of Law Because Plaintiff Cannot Establish a Prima Facie Case of Retaliation for First Amendment Retaliation**

**A. Claims Under 42 U.S.C. § 1983**

Plaintiff asserts a claim against defendants for a violation of 42 U.S.C. § 1983.  Section 1983 imposes civil liability upon any person who, while acting under color of state law, deprives another individual of rights, privileges and immunities secured by the Constitution or federal law. Doe v. Delie, 257 F.3d 309, 314 (3d Cir. 2001).  Section 1983 "does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere."  Id. (citing Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)).  To prevail on a claim brought pursuant to section 1983, a plaintiff must show that (1) the defendant or defendants acted under color of law; and (2) their actions deprived the plaintiff of rights secured by the Constitution or federal statutes.  Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997) (citing Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993)).  Moreover, "[r]etaliation for the exercise of constitutionally-protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  In this case, it is undisputed that defendants acted under color of law. The central inquiry for the court, therefore, is whether defendants' actions violated rights secured by the Constitution or federal statutes – in this case, the right to free expression without retaliation secured by the First Amendment of the Constitution.

**B. Retaliation for First Amendment Rights**

An individual can bring a claim for retaliation against a government actor when that actor retaliates against the individual for exercising the right to free speech.  Anderson, 125 F.3d at 161 (3d Cir.1997); see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).  "The

Supreme Court has explicitly held that an individual has a viable claim against the government

when he is able to prove that the government took action against him in retaliation for his

exercise of First Amendment Rights."  Anderson, 125 F.3d at 160, citing Mt. Healthy City Sch.

Dist. Bd. of Educ., 429 U.S. 274.  It is well established that a plaintiff's retaliation claim is

subject to a three-step, burden shifting methodology.  Ambrose v. Twp. of Robinson, 303 F.3d

488, 493 (3d Cir. 2002) (citing Bd. of County Comm'rs v. Umbehr, 518 U.S. 669, 675 (1996)).

> First, a plaintiff must show that his conduct was constitutionally
> protected.  Second, he must show that his protected activity was a
> substantial or motivating factor in the alleged retaliatory action.
> Finally, the defendant may defeat the plaintiff's case "by showing
> that it would have taken the same action even in the absence of the
> protected conduct."

Id. (quoting Bd. of County Comm'rs v. Umbehr, 518 U.S. 669, 675 (1996)); see Merkle v. Upper

Dublin Sch. Dist., 211 F.3d 782, 793 (3d Cir. 2000); Green v. Philadelphia Hous. Auth.,105 F.3d

882, 885 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996); Watters v. City of

Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995); Swineford v. Snyder County Pa., 15 F.3d 1258,

1270 (3d Cir. 1994).

### C. Whether Plaintiff Engaged in Protected Speech

### 1. Constitutionally-Protected Expression In General and the Spence Test

What counts as constitutionally-protected expression under the First Amendment varies

according to the particular context at issue.  As the United States Supreme Court explained, "[i]t

is possible to find some kernel of expression in almost every activity a person undertakes – for

example, walking down the street or meeting one's friends at a shopping mall – but such a kernel

is not sufficient to bring the activity within the protection of the First Amendment." Dallas v.

Stanglin, 490 U.S. 19, 25-26 (1989).

While not speech in the literal sense, the Supreme Court long has recognized that non-verbal gestures and symbols may be entitled to First Amendment protection.  See Texas v. Johnson, 491 U.S. 397, 404 (1989).  For example, in Johnson the Supreme Court held that burning the United States flag in protest of the renomination of the president is communicative activity protected by the First Amendment.  Id. at 406; see Cohen v. California, 403 U.S. 15, 25 (1971) (holding that wearing a jacket which contained a four-letter expletive criticizing the draft is protected by the First Amendment); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514 (1969) (holding that wearing black armbands to school in protest of the Vietnam War is constitutionally-protected expression by the First Amendment).

The Supreme Court articulated a test for determining whether non-verbal conduct is constitutionally protected.  In Spence v. Washington, 418 U.S. 405, 410-411 (1974) (per curiam), the Court held that non-verbal conduct is protected when it (1) is intended to convey a particularized message and (2) in light of the circumstances, the likelihood is great that the message would be understood by those who viewed it.  Id.  In Spence, the Court reversed the conviction of an individual under a Washington statute which proscribed the exhibition of a United States flag with figures, symbols or other materials attached or superimposed on it.  Id. at 408.  The defendant in that case had taped a peace sign to an American flag.  Id. at 405.  The Court held that the conduct at issue was protected speech because the conduct occurred roughly simultaneously to the tragedy at Kent State University and the American invasion of Cambodia and could be understood as communicative in nature.  Id. at 410.  The Court stated:  "This was not an act of mindless nihilism.  Rather, it was a pointed expression of anguish . . . about the then-current domestic and foreign affairs of his government."  Id.

14

**2. Use of the Middle Finger Towards a Police Officer as Protected Expression**

Several courts have found that the use of the middle finger toward a police officer is protected speech.  See, e.g., Sandul v. Larion, 119 F.3d 1250, 1255 (6th Cir. 1997); Duran v. City of Douglas, 904 F.2d 1378 (9th Cir. 1990); Nichols v. Chacon, 110 F. Supp. 2d 1099, 1102 (W.D. Ark. 2000); Brockway v. Shepherd, 942 F. Supp. 1012, 1015 (M.D. Pa. 1996); see also Commonwealth v. Kelly, 758 A.2d 1284, 1288 (Pa. Super. Ct. 2000).  Many of these decisions examine the issue in the context of an arrest under a disorderly conduct or related statute.  They deal with whether the use of the middle finger and accompanying expletives is protected by the First Amendment or instead is obscene speech, fighting words, or otherwise unprotected by the First Amendment; and whether a police officer is entitled to qualified immunity for an arrest based in whole or in part upon this kind of expression.  The instant action does not deal with an arrest pursuant to a disorderly conduct statute.  The analysis in many of these decisions, however, is relevant to the issues the court must examine in this case.

Two courts of appeals have examined these issues and provided useful guidance.  In Sandul v. Larion, the United States Court of Appeals for the Sixth Circuit addressed whether summary judgment was improperly granted in the defendants' favor in a civil rights action brought pursuant to section 1983 based upon an arrest of the plaintiff-appellant after he had leaned out of a vehicle as it passed a group of abortion protesters, shouted "f–k you," and extended his middle finger to the group, which included a police officer standing nearby.  Sandul, 119 F.3d at 1252.  One of the defendants in Sandul, the police officer, believing that the plaintiff's conduct violated a disorderly conduct ordinance, pursued the plaintiff's vehicle to the plaintiff's home, had an altercation with the plaintiff, called for backup assistance, and ultimately assisted in arresting the plaintiff and charging him with disorderly conduct based upon his use of

the middle finger and the shouted expletive.  Id. at 1252-53.[2]  The plaintiff in Sandul asserted

violations of his First, Fourth, and Fourteenth Amendment rights under section 1983.  Id. at

1253.  After one round of appeal, the district court on remand entered summary judgment with

respect to the First Amendment issue in favor of the defendant officer, holding that there was no

violation of plaintiff's First Amendment rights based upon the arrest for disorderly conduct and

that, even if the ordinance was unconstitutional, the defendant officer was entitled to qualified

immunity.  Id.

The United States Court of Appeals for the Sixth Circuit reversed the district court's

grant of summary judgment and remanded the case for further proceedings.  Id. at 1252.  The

court of appeals first determined that the plaintiff's actions were protected speech, relying on

precedent from the United States Supreme Court.  Id. at 1254-55.  The court of appeals relied in

part upon the Supreme Court's holding in Cohen v. California, 403 U.S. 15, 26 (1971), that use

of an expletive – indeed use of the same phrase as the phrase at issue in Sandul, "f–k you" –  is

not in itself criminal behavior absent some further showing.  Sandul, 119 F.3d at 1255.  "It is a

well-established that 'absent a more particularized and compelling reason for its actions, [a] State

may not, consistently with the First and Fourteenth Amendments, make the simple public display

. . . of [a] four-letter expletive a criminal offense.'"  Id. at 1254 (quoting Cohen, 403 U.S. at 26).

This kind of language is entitled to First Amendment protection, the court of appeals explained,

> although it appears to have little redeeming value [because] "while
> the particular four-letter word being litigated here is perhaps more
> distasteful than others of its genre, it is nevertheless often true that
> one man's vulgarity is another's lyric. . . . [and] largely because
> governmental officials cannot make principled distinctions in this

---

[2] The plaintiff in Sandul was also charged with felonious assault based upon his
subsequent altercation with the police.  Id.

area [,] the Constitution leaves matters of taste and style so largely
to the individual."

Id. at 1254-55 (quoting Cohen, 403 U.S. at 25).

In addition, the court of appeals in Sandul, noting the expansiveness of First Amendment

protection, found that the use of the middle finger and expletive did not fall within the "fighting

words" exception to First Amendment protection set forth by the Supreme Court in Chaplinsky v.

New Hampshire, 315 U.S. 568 (1942).  Sandul, 119 F.3d at 1255.  In Chaplinsky, the Supreme

Court defined "fighting words" as words which by their very utterance inflict injury or tend to

incite an immediate breach of the peace, noting that "any benefit from them is clearly outweighed

by the social interest in order and morality." 315 U.S. at 572.  The court of appeals in Sandul

noted the limited nature of the fighting words exception and determined that the plaintiff's words

and actions in that case did not rise to the level of fighting words.  119 F.3d at 1255.  The court

of appeals determined that the plaintiff's words and actions were speech protected by the First

Amendment.  Id.[3]

In Duran v. City of Douglas, 904 F.2d 1372 (9th Cir. 1990), the United States Court of

Appeals for the Ninth Circuit confronted a similar issue.  In Duran, one of the plaintiffs was

arrested for disorderly conduct after shouting expletives in Spanish and making obscene gestures

towards a police officer.  Id.  at 1372.  The incident arose after the plaintiff, who spent the night

---

[3]The court of appeals in Sandul further determined that under Chaplinsky and Cohen, and
the Supreme Court's more recent decision in Texas v. Johnson, 491 U.S. 397 (1989), Sandul's
right to use the "f-word" unless it constituted fighting words was clearly established and,
applying the objective reasonableness standard, "a reasonable officer should have known that the
words and gestures employed by Sandul amounted to protected speech."  Id.  The court of
appeals held that the defendant officer was not entitled to qualified immunity because his actions
violated the plaintiff's clearly established First Amendment rights which a reasonable officer
should have known.  Id. at 1256-57.  The court of appeals found that the district court erred in
granting summary judgment in favor of the defendant officer.  Id. at 1257.  The issue of qualified
immunity will be discussed in more detail in Part III infra.

drinking, was asked to leave a bar by the defendant officer.  Id.  Later, while patrolling the

highway, the defendant officer noticed someone, later determined to be the plaintiff, shouting

expletives and making obscene gestures towards him.  Id.  The defendant officer subsequently

followed the plaintiff and his wife, who was driving their vehicle, to their home while the

plaintiff continued to shout expletives and make obscene gestures at him.  Id.  At the plaintiff's

residence, the defendant officer initiated a traffic stop and arrested the plaintiff for disorderly

conduct.  Id.  at 1375.  A scuffle ensued and the plaintiff required medical care for a dislocated

elbow.  Id.  The plaintiff and his wife brought a section 1983 action against the defendant officer

and the municipality for an unlawful stop and arrest.  Id.  The plaintiffs moved for partial

summary judgment asking for a determination of liability with respect  to the defendant officer

and the defendant officer moved for summary judgment on the issue of qualified immunity.  Id.

The district court entered an order in favor of the plaintiffs on both motions.

The United States Court of Appeals for the Ninth Circuit affirmed in part, reversed in

part, and remanded the case for further proceedings.  Id. at 1379.  The court of appeals upheld the

district court's determination that the plaintiffs were entitled to summary judgment on the issue

of the defendant officer's liability for a violation of the plaintiff's Fourth Amendment rights.  Id.

at 1377.  The court noted that "[m]issing from the record here is any legitimate, articulate reason

for [the defendant officer] to have detained [the plaintiff]."  Id.

> However, because the car was traveling late at night on a deserted
> road on the outskirts of town, [the plaintiff's] conduct could not
> have disturbed the peace or incited a riot; [the defendant officer]
> has presented no evidence showing that it could have.  Nor could
> [the plaintiff's] conduct suggest that he had committed or was
> about to commit any other illegal act.  Indeed, one would expect
> someone engaged in shady business to act in a more stealthy
> fashion than did the plaintiff here.  In sum, we don't see how [the
> plaintiff's] boisterous conduct – tasteless though it may have been
> – gave [the defendant officer] any cause to detain him.  Absent

> such cause, the stop and detention was illegal and may be the
> subject of liability.

Id. (footnotes omitted).

The court of appeals in Duran determined that the defendant officer's conduct suggested a possible motive for plaintiff's detention "upon which law enforcement officers may not legitimately rely." Id. at 1377. Evidence suggested that the defendant officer may have stopped the plaintiffs' car at least partly in retaliation for the insult he received from the plaintiff. Id. at 1377-78. The court of appeals commented: "If true, this would constitute a serious First Amendment violation [because] 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" Id. at 1378 (quoting City of Houston v. Hill, 482 U.S. 451, 461 (1987)). "The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state." Hill, 482 U.S. at 461. The court of appeals in Duran explained that "while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." Duran, 904 F.2d at 1378.

> Inarticulate and crude as [the plaintiff's] conduct may have been, it
> represented an expression of disapproval toward a police officer
> with whom he had just had a run-in. As such, it fell squarely within
> the protective umbrella of the First Amendment and any action to
> punish or deter such speech – such as stopping or hassling the
> speaker – is categorically prohibited by the Constitution.

Id.

The court of appeals decided, however, that although the defendant officer admitted in a deposition that he stopped the plaintiff because he made an obscene gesture and yelled

profanities toward him, and summary judgment in favor of the defendant officer would have been inappropriate, the defendant officer's claim that he had no retaliatory motive meant that summary judgment in favor of the plaintiff was also error.  Id.  "There remains a material issue of fact, therefore, whether [the defendant officer] intended to hassle [the plaintiff] as punishment for exercising his First Amendment rights."  Id.  The court of appeals, having upheld the district court's grant of summary judgment on plaintiff's Fourth Amendment claim, determined that adjudicating the plaintiffs' First Amendment claims would probably be redundant and left that issue for the district court to determine on remand.  Id. n.5.

Federal district court opinions also shed light upon the issues before the court in this case.  See, e.g., Nichols v. Chacon, 110 F.Supp.2d 1099 (W.D.Ark. 2000); Brockway v. Shepherd, 942 F.Supp. 1012 (M.D.Pa. 1996).  In Brockway, a vehicle passenger was arrested for disorderly conduct after gesturing toward a police officer with his middle finger.  942 F.Supp. at 1013-14.  The passenger brought a section 1983 lawsuit against the officer alleging that he was arrested without probable cause.  Id.  The court in Brockway reached the question whether the expression at issue was protected under the First Amendment because Pennsylvania's disorderly conduct statute prohibited "obscene language" and "obscene gestures" and courts had determined that for the purposes of Pennsylvania's statute, "the definition of 'obscene' is consistent with that applied for purposes of determining what material is not protected under the First Amendment."  Id. at 1015.  The court determined that the gesture made by the plaintiff in Brockway did not support a charge of disorderly conduct under the statute.  Id. at 1017.  The court found that the gesture was not sufficient to constitute "fighting words."  Id.  By inference, Brockway can be interpreted to hold that the use of the middle finger in that context was protected expression under the First

Amendment.[4]  See Nichols v. Chacon, 110 F.Supp.2d 1099, 1102 (W.D. Ark. 2000) (section 1983 lawsuit based upon defendant officer issuing a citation for disorderly conduct in response to plaintiff gesturing at him with his middle finger).  In Nichols, the district court discussed the precedents cited above, including, inter alia, the Supreme Court's decisions in Cohen v. California, Chaplinsky v. New Hampshire, and City of Houston v. Hill, as well as Sandul v. Larion, Duran v. City of Douglas, and Brockway v. Shepherd, all discussed infra.  The court in Nichols determined that granting summary judgment in favor of the plaintiff was appropriate.  "While we agree the gesture utilized by [the plaintiff] was crude, insensitive, offensive, and disturbing to [defendant's] sensibilities, it was not obscene under the relevant Supreme Court precedent, did not constitute 'fighting words,' and was protected as 'free speech' under the First Amendment."  Id. at 1110.[5]

---

[4]The court in Brockway nonetheless dismissed plaintiff's section 1983 claim on the defendant officer's Rule 12(b)(6) motion on qualified immunity grounds because the court found that the right in question was not clearly established at the time.  The court cautioned that going forward:

> It is important, however, at some point to establish firmly the right in question.  We therefore emphasize: The use of profane or vulgar language is protected by the First Amendment unless some exception to the general principle applies.  That is, standing alone, profane or vulgar language is not itself obscene and does not amount to fighting words.  The same principle applies to the use of a gesture which represents profane or vulgar language, and the communication must be looked at in its entirety and in context to determine whether an exception to the general protection of speech applies.

Brockway, 942 F.Supp. at 1017.

[5]The court in Nichols held that the right was clearly established as of August 6, 1998, and that the defendant officer thus was not entitled to qualified immunity.  Nichols, 110 F.Supp.2d at 1110.

The weight of federal authority establishes that directing the middle finger at a police officer is protected expression under the First Amendment absent some particularized showing that the gesture in the specific factual context constitutes "fighting words"or is otherwise illegal. See Commonwealth v. Kelly, 758 A.2d 1284, 1288 (Pa. Super. Ct. 2000) (overturning a conviction for disorderly conduct when the defendant said "f–k you, a–hole" and gestured with his middle finger at a street department worker).  What makes this case more challenging than the situations described in the decisions discussed previously is that plaintiff denies directing the middle finger toward defendant Nassan.  The evidence of record, including defendant Nassan's handwritten notes on the citation and his own testimony, however, could support a finding that plaintiff did gesture with his middle finger.

### 3. Plaintiff's Denial that He Actually Directed His Middle Finger at Defendant Nassan

Defendants contend that they are entitled to summary judgment because plaintiff cannot prove the first element of making a prima facie case – that he was engaged in constitutionally-protected speech.  While plaintiff's section 1983 case would be stronger, and the court's job easier, if plaintiff did not dispute that he directed the middle finger at defendant Nassan, the court disagrees with defendants that this fact alone nullifies plaintiff's First Amendment retaliation claim.  Even if defendants are correct that plaintiff is bound by his own testimony that he did not gesture with his middle finger, a reasonable jury could find  that the gestures described by plaintiff – a nod and wave – were intended as a criticism of defendant Nassan's behavior and were understood by defendant Nassan as criticism – i.e., a reasonable inference because defendant Nassan believed plaintiff gestured with his middle finger.

The Supreme Court has a long history of upholding an individual's First Amendment right to criticize police officers.  "[T]he First Amendment protects a significant amount of verbal

criticism and challenge directed towards police officers." <u>Hill</u>, 482 U.S. at 461.[6]  As noted

previously, and by several courts that considered the issue, "[t]he freedom of individuals verbally

to oppose or challenge police action without thereby risking arrest is one of the principal

characteristics by which we distinguish a free nation from a police state."  <u>Id.</u> at 462-63.  Indeed,

the majority in <u>Hill</u> cited the Court's earlier opinion in <u>Lewis v. City of New Orleans</u>, 415 U.S.

130 (1974), in support, noting as well Justice Powell's concurring opinion in <u>Lewis</u> which

suggested that even the "fighting words" exception recognized in <u>Chaplinsky</u> "might require a

narrower application in cases involving words addressed to a police officer, because 'a properly

trained officer may reasonably be expected to "exercise a higher degree of restraint" than the

average citizen, and thus be less likely to respond belligerently to "fighting words."'"  <u>Id.</u> at 461-

62 (quoting <u>Lewis</u>, 415 U.S. at 135).

     The enhanced protection of verbal criticism directed toward the police extends also to

non-verbal criticism directed toward the police, as the decisions examining the use of the middle

finger illustrate.  On this theory, even if plaintiff was merely waving and nodding in the manner

of the British royal wave, that wave and nod could be constitutionally-protected behavior if it

was intended as a criticism of defendant Nassan, a police officer, and could be understood by him

as criticism.  Under the standard set forth in <u>Spence</u>, a reasonable jury could determine that the

nod and wave gesture made by plaintiff were protected speech.[7]

---

[6]In <u>Hill</u>, the plaintiff was arrested for violating a municipal statute which made it
unlawful to interrupt a police officer in the performance of his duties. <u>Id.</u> at 463. The Court
affirmed an en banc decision invalidating the statute for being unconstitutionally overbroad under
the First Amendment.  <u>Id.</u> at 462-63.

[7]  As discussed <u>supra</u>, the <u>Spence</u> test requires that for non-verbal conduct to be
expression that can be analyzed under the First Amendment, there must be an intent to convey a
specific message and a substantial likelihood that the message would be understood by those
receiving it.  <u>Spence</u>, 418 U.S. at 410-11.

Given the surrounding circumstances – including the previous traffic citations, plaintiff and defendant Nassan's disagreement about whether plaintiff was going 70 miles per hour, the discussion between the two concerning defendant Nassan's stated intention to continue to follow plaintiff as he drove to the airport, and plaintiff's testimony that this so flustered him that he considered getting off at a different exit  – a reasonable jury could find that, by the nod and wave, plaintiff intended to convey a particularized message (for example, a message criticizing defendant Nassan for his behavior at the previous traffic stop) and a reasonable jury could conclude that there was a substantial likelihood that the gesture would be understood by defendant Nassan as such.  Nothing in plaintiff's deposition, or in the record before this court, indicates that plaintiff did <u>not</u> intend by his acknowledged gesture to criticize defendant Nassan. Under these circumstances summary judgment cannot be granted in favor of defendants because there is a genuine issue of material fact whether, even if plaintiff merely nodded and waved, these actions were constitutionally-protected criticism of the police.

### D.  Whether Plaintiff's Behavior Was A Substantial or Motivating Factor in the Issuance of the Citation

To prove retaliation for constitutionally-protected behavior, if a plaintiff makes out the first element of his prima facie case that he was engaged in constitutionally-protected activity, he must also establish the second element of his prima facie case – that his protected activity was a substantial or motivating factor in the alleged retaliatory action.  <u>Ambrose</u>, 303 F.3d 488 at 493. Here, there clearly is a genuine issue of material fact concerning whether defendant Nassan issued plaintiff the second citation in retaliation for the middle finger gesture that he perceived plaintiff to be directing at him or for some other reason, such as his proffered reason that he was only interested in the proper hand signal violation.  <u>See</u> Nassan Dep. at 26-28.  Defendant Nassan's handwritten description of the violation in the citation itself, as well as his own

testimony, raise sufficient suspicion into his motives for issuing the citation that summary

judgment in defendant Nassan's favor is inappropriate.  See Duran, 904 F.2d at 1378 (where the

defendant officer admits that he stopped the plaintiff for gesturing with his middle finger and

yelling obscenities but maintains that he had no retaliatory motive, "[t]here remains a material

issue of fact, therefore, whether [the defendant officer] intended to hassle [the plaintiff] as

punishment for exercising his First Amendment rights"); see also Nichols, 110 F.Supp.2d at 1101

(granting summary judgment in favor of the plaintiff when the defendant officer admitted that he

"gave him what he deserved, a citation" for disorderly conduct based upon plaintiff's middle

finger gesture at the defendant officer).


## II.  Qualified Immunity

### A.  Probable Cause

If a plaintiff does make out a prima facie case of retaliation, "the defendant may defeat

the plaintiff's case 'by showing that it would have taken the same action even in the absence of

the protected conduct.'"  Ambrose, 303 F.3d at 493 (quoting Bd. of County Comm'rs v. Umbehr,

518 U.S. 669, 675 (1996)).  Defendants argue that they are entitled to qualified immunity[8] as a

matter of law because defendant Nassan had probable cause to issue the citation, incorporating

by reference the argument set forth in their brief in support of their motion to dismiss.  (Doc. No.

26).  The court understands this argument in the context of the proof required for section 1983

claims to be an argument that, even if defendant Nassan had a retaliatory motive for issuing the

---

[8]Defendants asserted that probable cause either defeats the merits of plaintiff's claim or is a basis for qualified immunity.  In this case, given that plaintiff raises a First Amendment claim and not a Fourth Amendment claim, this argument implicates the applicability of qualified immunity and not questions relating to the merits.

citation, defendants are entitled to judgment as a matter of law because defendant Nassan had probable cause to issue the citation.

Defendants cite Mozzochi v. Borden, 959 F.2d 1174, 1179-80 (2d Cir. 1992), in support of this argument that qualified immunity shields an officer from a retaliation claim where a reasonable officer would believe that the arrest and prosecution at issue were supported by probable cause.  The United States Court of Appeals for the Second Circuit, however, subsequently limited the holding in Mozzochi and another similar decision to retaliatory arrest claims, determining their holding did not apply to other variations of retaliation claims.  Blue v. Koren, 72 F.3d 1075,1083 n.5 (2d Cir. 1995) (noting that Mozzochi and the other decisions were "troubling in that they appear to negate the existence of a retaliation claim involving arrests" and "[i]f probable cause provides qualified immunity from a retaliation claim, then such a claim can be asserted only in cases in which a false arrest claim can also be made.").

Defendants argue that the United States Court of Appeals for the Third Circuit adopted a similar principle in Merkle v. Upper Dublin School District, 211 F.3d 782 (3d Cir. 2000). Merkle involved a teacher who sued the school district that she previously worked for and certain police officers for violations of her First, Fourth, Sixth, and Fourteenth Amendment rights as well as for state law claims of defamation, invasion of privacy, false arrest, and malicious prosecution based upon the school district and police defendants pursuing a criminal theft charge against her when she unlawfully took school supplies.  The court struggles to understand defendants' reliance on Merkle as its applicability to this case is not clearly set forth in the briefs. To the extent that the court understands defendants' argument, the court disagrees with defendants that Merkle suggests that a plaintiff cannot make out a retaliation claim based upon an arrest if the arresting officer had probable cause to make that arrest.  In Merkle the court of

appeals held that a police officer had probable cause to arrest the plaintiff for the theft and

therefore upheld the district court's grant of summary judgment in favor of the defendant with

respect to the plaintiff's Fourth Amendment claim.  Id. at 789-90.  The court of appeals,

however, reversed the district court's grant of summary judgment in favor of the school district

and its superintendent with respect to the plaintiff's First Amendment retaliation claim, holding

that, on the facts of that case, there was a disputed issue of fact whether these defendants acted

with retaliatory motives.  Id. at 793-94.

Similarly here, even if there was probable cause for defendant Nassan to issue a citation

to plaintiff for an improper hand signal violation, that would not defeat plaintiff's First

Amendment retaliation claim.  While the question whether he had probable cause to issue the

citation for an improper hand signal may be relevant to his motive in issuing the citation and to

the First Amendment retaliation query, and while it also might impact on his credibility, the issue

in this case will be whether he issued the citation in retaliation for plaintiff's exercise of First

Amendment rights.  See Blue, 72 F.3d at 1083 n.5; see also  Anderson 125 F.3d at 161 ("[A]n

otherwise legitimate and constitutional government act can become unconstitutional when an

individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment

speech.  This doctrine demonstrates that, at least where the First Amendment is concerned, the

motives of government officials are indeed relevant, if not dispositive, when an individual's

exercise of speech precedes government action affecting that individual.").

Moreover, even if defendants were correct on the law with respect to this argument, there

remains a genuine issue of material fact whether defendant Nassan had probable cause to issue

the citation for a violation of the improper hand signal provision.  See Merkle, 211 F.3d at 788

("Generally, 'the question of probable cause in a 1983 damage suit is one for the jury.'") (quoting

Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir.1998)).

### B.  Clearly Established Right

Plaintiff maintains that the First Amendment right to be free from retaliation for gesturing at a police officer with the middle finger, which defendant Nassan perceived and allegedly reacted to, is clearly established.  The privilege of qualified immunity recognizes the balance between the need for a forum to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening government officials to suit for the discretionary exercise of their public duties.  Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982).  The United States Supreme Court resolved these competing concerns "by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 632, 638 (1987).[9]

In order to determine whether an official is entitled to qualified immunity, an objective inquiry is required into the reasonableness of the actions of government officials that permits government officials to anticipate when their conduct may give rise to liability for damages.  Id. at 645-66.  The privilege affords "protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  When it attaches, the privilege of qualified immunity "is an *immunity from suit* rather than a mere defense to liability" which is lost if defendants are permitted to go to trial.  Saucier v. Katz, 533 U.S. 194, 200-01

---

[9]The United States Court of Appeals for the Third Circuit recognized "that there is a compelling need for such protective doctrine because of the severe chilling effect numerous suits for damages would have on prospective officials."  Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir. 1994).

(2001).[10]  Once qualified immunity is asserted by a defendant, the plaintiff has the burden of

demonstrating the privilege should not attach.  <u>McLaughlin v. Watson</u>, 271 F.3d 566, 570 (3d

Cir. 2001).

  An analytical framework was developed to test whether defendants such as defendant

Nassan are entitled to qualified immunity.  Under this framework, the inquiry into the claim of

qualified immunity is distinct from the inquiry into the merits of the claim.  <u>Saucier</u>, 533 U.S. at

197.  First, the court must determine whether the facts, taken in a light most favorable to

plaintiff's allegations, show that defendant Nassan's conduct violated a federal right or

constituted a constitutional violation.  <u>Id</u>. at 201.  In determining this first step, the court should

"set forth principles which will become the basis for a holding that a right is clearly established."

<u>Id</u>.

  If a federal right would be violated based upon a plaintiff's allegations, the court must

move to the next step: whether the federal right alleged to be violated was clearly established to a

degree of particularity within the specific context of the case at issue.  <u>Id</u>.  A broad and

generalized declaration that a clearly established federal right was violated is insufficient.

<u>Anderson</u>, 483 U.S. at 640.  For example, in <u>Anderson</u>, the Supreme Court determined that for

purposes of applying the qualified immunity privilege, the simple assertion that the Fourth

Amendment prohibits warrantless searches without probable cause and exigent circumstances

was not enough to demonstrate that the defendants' conduct violated a "clearly established" right

under the particular facts of that case.  <u>Id</u>. at 640-41.  Instead, the Court stated that, in order for a

---

[10]The Supreme Court "repeatedly . . . stressed the importance of resolving immunity
questions at the earliest stage in litigation."  <u>Saucier</u>, 533 U.S. at 201 (citing <u>Hunter v. Bryant</u>,
502 U.S. 224, 227 (1991) (<i>per curiam</i>)).

right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id.

If a rule requiring particularity was not in place, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id. at 639. The net effect would be to transform "a guarantee of immunity into a rule of pleading." Id. Thus, for the second prong of the framework, a right is "clearly established" where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. If the court determines that a review of the particular context demonstrates that the rights alleged to have been violated have been "clearly established," the court reaches the third and final step in the analytic framework: "whether a reasonable government official should have known that the alleged action violated the plaintiffs' rights." Doe v. County of Centre, Pa, 242 F.3d 437, 454 (3d Cir. 2001).

The Supreme Court of the United States instructs that determining whether a right was "clearly established depends, in large degree, on the degree of particularity within the specific context of the case at issue." Saucier, 533 U.S. at 197. Other courts have noted that a public official is considered to have constructive knowledge of established law. Cannon v. City & County of Denver, 998 F.2d 867, 874 n.6 (10th Cir. 1993). In addition, the Supreme Court has instructed lower courts to apply all precedents within their knowledge in deciding the issue of qualified immunity. Elder v. Holloway, 510 U.S. 510 (1994).

As the court discussed in detail in Part I of this discussion, numerous courts have recognized that the First Amendment right to be free from retaliation in response to constitutionally-protected speech is clearly established – and more specifically, that this right

encompasses the right to gesture with the middle finger and even use expletives directed towards

a police officer so long as the conduct does not constitute fighting words – and that a reasonable

officer should know that it is constitutionally-protected behavior.  See, e.g., Sandul, 119 F.3d at

1256-57; Duran, 904 F.2d at 1378.  Under the standard set forth by the United States Court of

Appeals for the Third Circuit, "there must be sufficient precedent at the time of action, factually

similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is

constitutionally prohibited."  McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).

Here, if plaintiff gestured at defendant Nassan with the middle finger, there is sufficient

precedent to put defendant Nassan on notice that his alleged conduct is constitutionally

prohibited.  The qualified immunity analysis is more difficult if plaintiff merely nodded and

waved at defendant Nassan.  If, as plaintiff testified, plaintiff gestured at defendant Nassan with a

"nod and a wave," this conduct too, if determined to be a gesture intended and understood as

criticism of the police, could be considered protected speech to which it is clearly established that

a police officer cannot retaliate.  See Duran, 904 F.2d at 1378 ("No less well established is the

principle that government officials in general, and police officers in particular, may not exercise

their authority for personal motives, particularly in response to real or perceived slights to their

dignity."); Hill, 482 U.S. at 2509 ("[T]he First Amendment protects a significant amount of

verbal criticism and challenge directed at police officers" and "[t]he freedom of individuals

verbally to oppose or challenge police action without thereby risking arrest is one of the principal

characteristics by which we distinguish a free nation from a police state.").

## III.  Supervisory Liability

Defendants argue that the claim against defendant Miller is purely derivative and based

upon the claim against defendant Nassan, and because the claim against defendant Nassan fails

as a matter of law, the claim against defendant Miller in his supervisory capacity also fails as a

matter of law.  Plaintiff responds that supervisory liability against defendant Miller could be

found based upon the testimony of defendant Nassan indicating that, according to his

understanding from his training, he can give a citation to someone for gesturing with their middle

finger provided that someone other than a police officer is offended or provoked by it.  Plaintiff

argues that defendant Nassan's understanding is a misstatement of the law, and indicates that

defendant Nassan's training with the State Police – defendant Miller is the Commissioner of the

State Police – was inadequate and that the training constitutes "deliberate indifference" by

defendant Miller that makes defendant Miller liable under Canton v. Harris, 489 U.S. 378 (1989).

     Prior to the Supreme Court's holding in Canton, the United States Court of Appeals for

the Third Circuit did not recognize supervisory liability for section 1983 actions unless there was

shown some affirmative conduct by the supervisor that played a role in the violation of rights.

See Chinchello v. Fenton, 805 F.2d 126, 133-34 (3d Cir. 1986); Lach v. Robb, 679 F.Supp. 508,

513 (W.D.Pa. 1988); see also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir.

1997).  In Chinchello the court of appeals noted the Supreme Court's previous decision in Rizzo

v. Goode, 423 U.S. 362, 377 (1976), in which the Supreme Court rejected the argument that a

supervising public official has an affirmative constitutional duty to supervise and discipline in a

manner to prevent violations of constitutional rights by his or her subordinates.  Id. at 133.  The

court of appeals noted that the Supreme Court in Rizzo held instead that "even where a pattern of

constitutional violations by subordinates is shown, supervising officials do not violate the

constitutional rights of the victims of such misconduct unless they have played an 'affirmative

part' in that misconduct."  Id. (quoting  Rizzo, 423 U.S. at 377).

The court of appeals in Chinchello went on to explain that the United States Court of Appeals for the Third Circuit in decisions since Rizzo held that "to be legally responsible, supervising officials 'must have played an affirmative role in the deprivation of the plaintiffs' rights,' noting that 'the officials' misconduct cannot be merely a failure to act.'" Id. (quoting Commonwealth of Pennsylvania v. Porter, 659 F.2d 306, 336 (3d Cir. 1981) and citing Black v. Stephens, 662 F.2d 181 (3d Cir. 1981), cert. denied, 455 U.S. 1008 (1982) ("We held, once again, that while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct.")).  The court of appeals in Chinchello commented, however, that "some Courts of Appeal have been more willing than ours to infer supervisory approval of unconstitutional conduct from inaction on the part of the supervisor."  Id. (citing Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir.1980); Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir.1980);  Sims v. Adams, 537 F.2d 829 (5th Cir.1976)).

> The courts taking this view, however, have found liability only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate.

Id.  The court of appeals noted that the plaintiff's allegations in Chinchello satisfied neither of these essential elements of liability.  Id.

The Supreme Court in Canton, however, upon which plaintiff relies in his opposition brief, considered and announced the degree of fault required to hold a public entity liable for failure to train public employees.  Canton, 489 U.S. at 388-92.  The Supreme Court held that only where a public entity's failure to train its employees in a relevant respect reflects a deliberate indifference to the constitutional rights of its inhabitants can such a claim yield liability.

Canton,489 U.S. at 392; see also Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1999)(interpreting

Canton).  "We hold today that the inadequacy of police training may serve as the basis for § 1983

liability only where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact."  Id. at 388 (emphasis added).  The Supreme Court

further commented that:

> This rule is most consistent with our admonition . . . that a
> municipality can be liable under § 1983 only where its policies are
> the "moving force [behind] the constitutional violation."  Only
> where a municipality's failure to train its employees in a relevant
> respect evidences a "deliberate indifference" to the rights of its
> inhabitants can such a shortcoming be properly thought of as a city
> "policy or custom" that is actionable under § 1983.  As Justice
> BRENNAN's opinion in Pembaur v. Cincinnati, 475 U.S. 469,
> 483-484. . . (1986) (plurality) put it: "[M]unicipal liability under §
> 1983 attaches where – and only where – a deliberate choice to
> follow a course of action is made from among various alternatives"
> by city policymakers. . . . Only where a failure to train reflects a
> "deliberate" or "conscious" choice by a municipality – a "policy"
> as defined by our prior cases – can a city be liable for such a failure
> under § 1983.

Id. at 388-89.  The Supreme Court explained that a lower standard of fault would leave public

entities open to unprecedented liability under section 1983.  Id.

This standard of fault has been held to apply not only to public entities themselves, but to

individual supervisory public officials as well.  See Sample, 885 F.2d at 1118.  The United States

Court of Appeals for the Third Circuit since Canton requires that a plaintiff alleging supervisory

liability of the sort contemplated by plaintiff for failure to train must make a showing identifying

a specific practice or procedure that the supervisor failed to employ.  Id.  Further, the court of

appeals requires a district court to make specific findings that existing custom or practice without

that specific practice or procedure creates a risk of violations, that the supervisor was aware of

the risk and indifferent to it, and that the alleged underlying violation by the public employee was a result of the supervisor's failure to employ that practice or procedure in training.  Id.  Plaintiff has failed to make that showing here, and the testimony of defendant Nassan alone without more is not sufficient to hold defendant Miller liable for failure to train in this circumstance.  It cannot support a finding that defendant Miller acted with "deliberate indifference" to plaintiff's constitutionally-protected right to be free from First Amendment retaliation.  Defendant Miller, therefore, is entitled to judgment as a matter of law with respect to plaintiff's claim that his failure to train defendant Nassan resulted in the violation at issue.

### Conclusion

**AND NOW**, this 25th day of September 2006, upon consideration of the motion for summary judgment filed by defendants Nassan and Miller (Doc. No. 25), and the submissions filed by both parties,

**IT IS HEREBY ORDERED THAT** defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**  Summary judgment is **GRANTED** in favor of defendants on plaintiff's claim against defendant Miller for supervisory liability and is **DENIED** with respect to plaintiff's claims against defendant Nassan for violations of plaintiff's First Amendment rights.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc:     Counsel of Record

35